## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| MICHELLE MORETTO, AMBER | ) | |
| ROBERTSON, ASHLEY M. MEHRZAD, | ) | |
| DAWN K. HOSTETLER, MARISSA | ) | |
| HUTTON, LARRY VICARY, | ) | |
| REBECCA MELLOY, RHONDA | ) | |
| RANDOLPH, RICHARD JOHNSTON, | ) | |
| STEVE VANDUSEN, CHARLES TYSON | ) | |
| MAY, ALEISHA KARRICK, and TRENT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 14-cv-1433-MMM |
| | ) | |
| TAZEWELL COUNTY SHERIFF'S | ) | |
| OFFICE, SHERIFF ROBERT HUSTON, in | ) | |
| his individual capacity, CHIEF DEPUTY | ) | |
| JEFF LOWER, in his individual capacity, | ) | |
| JAIL SUPERINTENDENT KURT | ) | |
| ULRICH, in his individual capacity, | ) | |
| JAIL SUPERINTENDENT EARL HELM, | ) | |
| in his individual capacity, DEPUTY JAIL | ) | |
| SUPERINTENDENT BILL ROTH, in his | ) | |
| individual capacity, and TAZEWELL | ) | |
| COUNTY, a unit of local Government, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is now before the Court on Defendants' Second Amended Motion for Summary

Judgment. For the reasons stated herein, Defendants' Motion is GRANTED IN PART AND

DENIED IN PART. Defendants' Motion is GRANTED with regard to Plaintiffs' First

Amendment retaliation claims based on grievance activity, and as to any and all claims against

Chief Deputy Jeff Lower. Defendants' Motion is DENIED as to Plaintiffs' retaliation claims based

on their participation in the October 7, 2010, no-confidence vote and Plaintiffs' political support

of Ron Davis in the 2010 Tazewell County Sheriff's election. The Court declines to exercise

supplemental jurisdiction over Plaintiff Mehrzad's pregnancy discrimination claim, and it is DISMISSED WITHOUT PREJUDICE. The Clerk of Court is directed to terminate Plaintiffs Hutton, May, Mehrzad, Strunk, and Vicary, and Defendant Lower as Parties in this matter.

## BACKGROUND

Plaintiffs consist of a group of thirteen current and former correctional officers working in the Tazewell County Jail who are employed at the Tazewell County Sheriff's Department. Plaintiffs allege they were systematically retaliated against for their union, political, and free speech activity during their tenure at the Department. Plaintiffs also contend one of the officers was discriminated against in her request for light duty because she was pregnant. The crux of Plaintiffs' claims revolve around two primary instances of alleged protected activity: Plaintiffs' participation in a no-confidence vote held against Sheriff Huston; and their support of Huston's opponent, Ron Davis, in the 2010 Tazewell County Sheriff's election.

On October 7, 2010, members of Fraternal Order of Police Union in Tazewell County, Illinois, held a no-confidence vote against Sheriff Huston. The vote was held during a union meeting with both correctional officers and sergeants comprising the union-member attendees. Members of the union had been unhappy with the Sheriff for failing to back the officers in several highly publicized jail incidents and wanted to communicate their dissatisfaction. Less than a month after the release of the vote results, Sheriff Huston was up for reelection. A number of Plaintiffs supported Ron Davis in the 2010 Sheriff's election by attending public debates, donating to his campaign fund, wearing pro-Davis shirts, placing election placards in their yards, and vocalizing their support among the officers at the jail.

Due to their support of Davis in the Sheriff's election, and because of their participation in the no-confidence vote, Plaintiffs allege Huston and other officials in the Sheriff's Department

retaliated against them in various ways, including denying their workers' compensation claims, failing to offer them opportunities for advancement, removing them from classification positions, eliminating and reclassifying the sergeant position as non-union, and denying their work-related grievances. This lawsuit followed.

## PROCEDURAL HISTORY

On November 7, 2014, Plaintiffs filed their initial Complaint pursuant to 42 U.S.C. § 1983, alleging three avenues for recovery (union association, political association, and free speech) for First Amendment retaliation against Defendants. On March 23, 2017, Plaintiffs filed their Second Amended Complaint, reincorporating their initial retaliation claims and adding an Illinois state law employment discrimination claim. On March 27, 2017, Defendants filed their answer, which included the affirmative defenses of qualified immunity and a two-year statute of limitations, among others. Defendants filed their Second Amended Motion for Summary Judgment[1] on May 4, 2018, and on August 24, 2018, Plaintiffs filed their Response.[2] Defendants filed their Reply on September 28, 2018. This Order follows.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A material fact is one that might affect the outcome of the suit." *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). "To survive summary judgment, the nonmoving party must

---

[1] Hereinafter referred to as "MSJ."
[2] Hereinafter referred to as "Resp."

show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Life Plans, Inc. v. Security Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018).

## DISCUSSION

As a preliminary matter, the Court finds Plaintiffs' participation in the October 7, 2010, no-confidence vote against Sheriff Huston was protected speech. The Court also finds Plaintiffs' support for Ron Davis in the 2010 Sheriff's election was protected speech. However, as delineated in Plaintiffs' Second Amended Complaint (*see* ¶¶ 21-26), and discussed in detail below, any grievance activity after the aforementioned events is not protected by the First Amendment and falls outside the scope of Plaintiffs' primary claims. For the purpose of clarity, the Court defines First Amendment retaliation, summarizes the activity of each Plaintiff and the instances of protected speech, and then analyzes whether the activity meets the requirements for retaliation as defined by the courts.

To establish a First Amendment retaliation claim, a public employee must demonstrate that (1) her speech was constitutionally protected; (2) she suffered a deprivation likely to deter free speech; and (3) her speech was at least a motivating factor in the employer's actions. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that her speech was at least a motivating factor of the employer's decision to take retaliatory action against her. *Kidwell*, 679 F.3d at 965. Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. *Id.* If the employer fails to counter the plaintiff's evidence, then the plaintiff has established the

causation needed to succeed on her claim. *Id.* Whether a government employee's speech is protected by the First Amendment is a question of law for the court to decide. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

In analyzing the first requirement of a retaliation claim, courts utilize the *Connick-Pickering* test to determine whether the employee spoke as a citizen on a matter of public concern. *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). Courts must first decide whether a plaintiff was speaking as a "citizen" or as part of her public job before analyzing the subject-matter of her speech. *Mills v. City of Evansville, Indiana*, 452 F.3d 646, 648 (7th Cir. 2006). In *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Supreme Court advised that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." (emphasis in original). Therefore, courts must first decide whether a plaintiff was speaking "as a citizen" or as part of her public job, before asking whether the subject-matter of particular speech is a topic of public concern. *Houskins,* 549 F.3d at 490.

If the court determines the employee spoke as a private citizen, it must then decide whether the employee spoke on a matter of public concern. In answering whether a statement rises to the level of public concern, courts look to the "content, form, and context" of the statement, *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)); of which "content remains the most important factor[.]" *Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009). If the objective of the speech—as determined by content, form, and context—is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern. *Kristofek*, 712 F.3d at 986; *cf. Gustafson*, 290 F.3d at 908 ("Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public

will not be protected if the expression addresses only the personal effect upon the employee or if the only point of the speech was to further some purely private interest.") (internal citation omitted). "But[,] if an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern." *Id.*

If the court determines the employee spoke as a private citizen on a matter of public concern, then it moves to the second part of the *Connick-Pickering* test: balancing the employee's interest "as a citizen in commenting on the matter" against the public employer's interest "in promoting effective and efficient public service." *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007). Defendants carry the burden of demonstrating that their interests as employers outweigh the employees' interests in speaking out on a matter of public concern. *Gustafson*, 290 F.3d at 906. The Seventh Circuit has identified certain factors that should be considered when determining whether the government's interest outweighs the First Amendment interests of a public employee. *Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014). These factors include:

> (1) whether the speech would create problems in maintaining discipline or harmony among coworkers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [her] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Id.* "Even if an employee's speech is on a matter of public concern, a government employer is entitled to restrict that speech if it can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the state, as employer, in promoting effective and efficient public service." *Gustafson*, 290 F.3d at 909. Yet,

"[t]he stronger the employee's interest in speaking, the more substantial a showing the state must make to justify its restriction of that speech." *Id.*

If the employee is found to have engaged in constitutionally protected speech under both prongs of the *Connick-Pickering* test, the court then analyses whether the employee suffered a deprivation likely to deter free speech. "Any deprivation . . . that is likely to deter the exercise of free speech . . . is actionable, if the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). "A [section] 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes," in order to be valid. *Mosley v. Bd. of Education of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006). For example, in *Bart v. Telford*, 677 F.2d 622 (1982), the Seventh Circuit held that a campaign of minor harassment was sufficient to deter the exercise of free speech. In *Walsh v. Ward*, 991 F.2d 1344, 1345 (7th Cir. 1993), it observed, "[a] campaign of petty harassment may achieve the same effect as an explicit punishment." And in *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995), the Court of Appeals declared, "[u]nder the law of this Circuit, retaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling employee speech on matters of public concern." Lastly, dismissal, denial of transfer, failure to recall after layoff, and refusal to promote are significant penalties that impermissibly encroach on First Amendment freedoms unless such practices are narrowly tailored to further vital government interests. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 73-75 (1990).

If the employee has been found to have engaged in constitutionally protected speech and suffered a deprivation likely to deter that speech, the court then moves on to the fifth, and final, "motivating factor" requirement. "[T]he 'motivating factor' requirement splits the burden of

production between the parties on summary judgment." *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) (citing *Kidwell*, 679 F.3d at 965). The plaintiff has the initial burden to produce evidence that her speech was at least a 'motivating factor' in the employer's decision to take adverse action against her. *Peele*, 722 F.3d at 960. "The defendant may then rebut that evidence by demonstrating that 'the harm would have occurred anyway,' even without the protected conduct." *Id.* (quoting *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)). "If the [defendant] successfully rebuts the causal inference, the burden shifts back to the plaintiff to demonstrate that the [defendant's] proffered reason was pretextual and that the real reason was retaliatory animus." *McGreal v. Village of Oak Park*, 850 F.3d 308, 313 (7th Cir. 2017) (internal citation omitted).

The plaintiff may fulfill her burden of proof by presenting either direct or circumstantial evidence. *Kidwell*, 679 F.3d at 965. "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hospital*, 150 F.3d 747, 751 (7th Cir. 1998) (internal citation omitted). "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Long v. Teachers' Retirement System of Illinois*, 585 F.3d 344, 350 (7th Cir. 2009)). "Regardless of which type of evidence is offered, to demonstrate the requisite causal connection in a retaliation claim, [a] plaintiff[ ] must show that the protected activity and the adverse action are not wholly unrelated." *Kidwell*, 679 F.3d at 966 (internal citation omitted). "On summary judgment . . . the plaintiff's burden is simply to demonstrate that there is a genuine issue of material fact on the question of causation." *Yahnke v. Kane County, Illinois*, 823 F.3d 1066, 1071 (7th Cir. 2016).

**Dawn Hostetler**

Dawn Hostetler began working at the Tazewell County Sheriff's Department as a correctional officer in 2003. (Hosteler Dep. at 8.) Hostetler was assigned a classification officer position at the Department for approximately four years, until 2010. (*Id.* at 8-10.) On April 1, 2010, Superintendent Earl Helm issued a memo altering the work assignments for officers Karrick, Hostetler, and Moretto. (*Id.* at 58.) The memo indicated Hostetler would be removed from the classification officer assignment on Tuesdays and Wednesdays, and that she would keep the assignment on Thursdays, Fridays, and Saturdays. (*Id.*) Hostetler testified she participated in the October 7, 2010, no-confidence vote against Sheriff Huston. (*Id.* at 43.) In November 2010, Hostetler was removed from her classification officer assignment and reassigned to pod officer, which Hostetler considered a demotion. (*Id.* at 60.) Hostetler testified she was demoted because correctional officers are paid less than classification officers. (*Id.*) Hostetler also testified she apologized to Sheriff Huston for the no-confidence vote eight to ten months after the vote was taken. (*Id.* at 80.) Hostetler was ultimately promoted to Field Training Officer ("FTO") sometime in 2017. (*Id.* at 38-40.)

**Marissa Hutton**

Marissa Hutton began working at the Sheriff's Department as a control room operator in 2006. (Hutton Dep. at 12.) In July 2007, Hutton became a correctional officer, and she is currently an FTO with the Department. (*Id.* at 13.) Hutton testified she "had nothing to do with the no-confidence vote" (*id.* at 71), and had no participation in the 2010 Sheriff's reelection campaign (*id.* at 93). Hutton also concedes she does not believe she was retaliated against individually. (*Id.* at 72.) Rather, Hutton alleges she was retaliated against as a member of a "group of [correctional officers]" (*id.*), and as a female (*id.* at 73). Hutton claims the Sheriff denied accrued

time donations in "retaliation" (*id.* at 126), but she cannot pinpoint any protected activity that motivated the retaliatory behavior (*see id.* at 126-27).

**Richard Johnston**

Richard Johnston began his tenure at the Sheriff's Department as a correctional officer in 1990. (Johnston Dep. at 8.) Johnston became a part-time sergeant in 1992, and transitioned to a full-time sergeant in 1996. (*Id.* at 10.) Johnston retired from the Department in 2015. (*Id.* at 33.) From October 2008 to June 2010, Johnston was suspended as a result of a use-of-force incident with a female detainee. (*Id.* at 35, 52, 112.) The Sheriff's Department also sought to terminate Johnston as a result of the incident (*id.* at 115), but the Merit Commission reinstated Johnston in 2010 (*id.*). Johnston attributes animosity from the Sheriff to his participation in the union / union's negotiation team and because he would not do the Sheriff's bidding. (*Id.* at 215.) Johnston testified he was present at the union meeting when the no-confidence vote was held (*id.* at 122-23), but there is no evidence in the record Johnston actually voted. (*See generally, Id.*) Johnston testified he publicly supported Ron Davis for Sheriff in 2010, by telling other officers of his support and by attending democratic fundraisers. (*Id.* at 125, 127.) Johnston was part of the union negotiation team until 2010. (*Id.* at 35.) Johnston was also lodge chaplain, vice president, and then president of the union until 2014. (*Id.* at 32.) Johnston was removed from his sergeant position when the jail was reorganized. (*Id.* at 171-72.) Johnston testified he felt the elimination of the position was discipline against he and VanDusen because they were "very vocal in union aspects." (*Id.* at 170-71.) Johnston also testified he did not apply for the Jail Operations Supervisor ("JOS") position because he was fearful the Sheriff would fire him if he accepted the non-union role. (*Id.* at 173.)

**Aleisha Karrick**

Aleisha Karrick was employed at the Sheriff's Department as a correctional officer from 2005 to November 15, 2014. (Karrick Dep. at 8, 16.) Karrick testified she participated in the no-confidence vote (*id.* at 69, 83), and afterward, her opportunity for advancement became slim to none (*id.* at 97). Karrick testified Superintendent Bill Roth told her and other third-shift officers they should "fluff the Sheriff's feathers" and apologize to him for the no-confidence vote. (*Id.* at 126-27.) Karrick applied for an FTO position, but cannot remember the exact timeframe. (*Id.* at 98.) Karrick also "liked" Ron Davis for Sheriff posts on Facebook and had a conversation about this activity with Superintendent Earl Helm. (*Id.* 159-60.) During the conversation with Helm, Helm allegedly told Karrick "there's a group of jailers that are driving the bus off a cliff over there and if they're not careful they're going to take [you] with them." (*Id.* at 159.) Karrick began training for a classification officer position in early 2010, but left the position after she discovered she would be replacing Michelle Moretto. (*Id.* at 122-23.) Karrick also testified Helm told her "they dug their own grave" when she informed Helm she was uncomfortable replacing Moretto. (*Id.* at 123.) Karrick testified, years after the no-confidence vote, she met with Sheriff Huston and informed him how she voted. (*Id.* at 89-91.) On April 1, 2010, Superintendent Helm issued a memo altering the work assignments for classification officers Karrick, Hostetler, and Moretto. (MSJ, ¶ 187.) Karrick was replaced as a classification officer in December 2010. (*Id.* at ¶ 189.)

**Charles Tyson May**

Charles Tyson May has been working at the Sheriff's Department as a correctional officer since October 2009. (May Dep. at 6.) May has not been disciplined while employed at the Department, outside of a disagreement with Superintendent Roth regarding the use of trade days. (*Id.* at 18-22.) May applied for a classification position early in his career, but cannot recall the

specific timeframe, and was not hired for that position. (*Id.* at 65.) In 2014, May filed a grievance regarding shift bidding (*see* ECF No. 114-5 at 48), which was ultimately resolved in his favor. (*Id.* at 49-52.) May testified he was present at the October 7, 2010, union meeting when the no-confidence vote was held (*id.* at 80), but he fails to indicate he actually voted (*see generally, id.*) There is also no indication in the record May participated in any of the Sheriff's reelection campaigns—either for or against the Sheriff. (*Id.*)

### Rebecca Melloy[3]

Rebecca Melloy has been working at the Sheriff's Department as a correctional officer since October 2006. (Melloy Dep. at 7.) Melloy attended the October 7, 2010, union meeting and participated in the no-confidence vote. (*Id.* at 123.) There is no indication in Melloy's deposition that she participated in any of the Sheriff's reelection campaigns—either for or against the Sheriff. (*See generally, Id.*) However, Sheriff Huston testified he saw that Melloy made a $300 donation to Ron Davis, via his opponent's financial reports filed with the state election board. (Huston Dep. at 18.) Additionally, Plaintiffs' Response references light-duty requests (Resp., ¶ 215), but Melloy testified she never submitted any light-duty requests. (Melloy Dep. at 36-37.) In April 2009, Melloy and VanDusen filed a grievance concerning the Sheriff's Department prohibition of them working together and prevailed. (*Id.* at 69.) Since 2010, Melloy has been passed over for an FTO position on numerous occasions. (*Id.* at 60-61.) On May 14, 2012, Melloy filed a grievance concerning an unfounded disciplinary reprimand she received (*see* ECF No. 133 at 70), and ultimately prevailed.

---

[3] Plaintiff Rebecca VanDusen is referenced using her maiden name in order to avoid conflating her claims with those of her husband, Plaintiff Steve VanDusen.

**Ashley Mehrzad**

Ashley Mehrzad worked at the Sheriff's Department as a correctional officer from March 2013 to September 2015. (Mehrzad Dep. at 11-12.) Mehrzad did not participate in the 2010 no-confidence vote against Sheriff Huston (*id.* at 14), and there is no indication in the record suggesting she participated in any of Sheriff Huston's reelection campaigns (*see generally, id.*) Mehrzad was not formally disciplined at any time during her tenure at the jail (*id.* at 67); however, she was denied a light-duty request to work at the jail while she was pregnant (*id.* at 111). The denial of her light-duty request comprises a separate employment discrimination claim against the Sheriff's Department. (*See* ECF No. 61 at 16-17.)

**Michelle Moretto**

Michelle Moretto began working at the Sheriff's Department as a correctional officer in 2001. (Moretto Dep. at 6-7.) Moretto has been at the Department, in various roles, for nearly sixteen years. (*Id.* at 13.) From 2002 until 2011, Moretto was assigned a classification officer position. (*Id.* at 14.) Moretto testified she participated in the no-confidence vote against the Sheriff. (*Id.* at 43.) Moretto also testified she supported Ron Davis in the 2010 Sheriff's election. (*Id.* at 46.) Moretto put a sign in her front yard and attended a couple of meetings. (*Id.* at 47.) In May 2011, Moretto lost her classification officer assignment when she returned to work after an injury. (*Id.* at 15, 48.) Upon her return, Moretto was assigned work as a correctional officer on third shift. (*Id.* at 14-15.) Moretto testified Superintendent Roth told her numerous times (the last time on December 17, 2013) that things would only get better if she apologized to the Sheriff for her participation in the no-confidence vote. (*Id.* at 94-95.) Moretto also testified she filed grievances concerning the ability to work light duty, the ability to receive donated accrued time, and the ability to carry over compensatory time. (*Id.* at 33.) Moretto testified she filed grievances

on behalf of the union concerning the dismantling of the Merit Commission, the elimination of the sergeant position, the privatization of the jail, and grievances on other topics. (*Id*. at 33.) Additionally, Moretto submitted four worker's compensation claims while employed at the Sheriff's Department in 2006, 2009, 2012, and 2013. (*Id.* at 7.)

**Rhonda Randolph**

Rhonda Randolph was employed at the Sheriff's Department as a correctional officer from 2003 through May 2015. (Randolph Dep. at 5, 11.) Randolph testified she participated in the no-confidence vote in 2010, and discretely supported Ron Davis in the 2010 Sheriff's campaign. (*Id.* at 105-06, 108-10.) Randolph explained her ex-husband was good friends with Davis, overtly supported him, and contributed to his campaign. (*Id.* at 109.) Randolph also testified she twice applied for an FTO position after the vote, but was not selected. (*Id.* at 13-14, 129.) Randolph also applied for a classification officer assignment, which she did not receive. (MSJ, ¶ 191.) Randolph testified that in January 2012, when she interviewed for a JOS position with Sheriff Huston, "he brought up the no-confidence vote—[and] said five or six people had came (sic) over there and told him that they voted no or they didn't vote at all, and . . . he didn't know who he could trust or not trust." (*Id.* at 22.) Randolph testified Huston told her "he heard that a lot of people were going to interview or apply for . . . the JOS job, and not take it, and he would hire six ball breakers from the streets if he had to to straighten us out." (*Id.* at 23.) Randolph also testified Commander Roth approached her in A-pod and told her "if everybody went over and apologized to the Sheriff that maybe things would get better for them . . . . [t]hat we wouldn't be getting so many restrictions and so many changes and stuff within the jail." (*Id.* at 71.) Randolph did not receive the JOS position (*id.* at 14) and was never disciplined as a correctional officer. (MSJ, ¶ 355.)

**Amber Robertson**

Amber Robertson has been working at the Sheriff's Department as a correctional officer since 2003. (Robertson Dep. at 8.) Robertson testified she voted no confidence against Sheriff Huston in 2010. (*Id.* at 18.) Robertson also testified she never participated in any of the Sheriff's reelection campaigns, other than to verbalize to family and friends the benefits to the jail if a new Sheriff was in charge. (*Id.* at 23.) Robertson signed up to be considered for an FTO position, but was not selected. (*Id.* at 46.) Robertson also sought a classification officer assignment, but was not selected. (*Id.* at 44.) Robertson was initially assigned to a classification officer position, but her training was suspended without explanation. (*Id.*) Robertson submitted a light-duty request due to a broken thumb, but her request was denied. (*Id.* at 23-24.) In 2015, Robertson applied for a JOS position, but was not selected. (MSJ, ¶ 311.) Robertson alleges her union association was given improper consideration in determining whether she was qualified to be a JOS. (Robertson Dep. at 26-27.) Robertson testified Superintendent Roth made the comment that "if we apologize [for the no-confidence vote], it will all go away." (*Id.* at 66.) Robertson also alleges Sheriff Huston made derogatory comments concerning the suit at hand during her interview for the JOS position. (*Id.* at 113-114.)

**Trent Strunk**

Trent Strunk began working at the Sheriff's Department in early 2004. (Strunk Dep. at 9.) Strunk started in the control room and became a correctional officer in August 2004. (*Id*. at 8-9.) Strunk testified he was not involved in the no-confidence vote (*id.* at 70) and that he informed Superintendent Roth as such (*id.* at 72). Strunk also testified he was not involved in any of Sheriff Huston's reelection campaigns. (*Id.* at 23.) Strunk applied for a sergeant position, but failed to pass the sergeant's exam. (*Id.* at 40.) Strunk also applied for an FTO position, but was not selected.

(*Id.* at 21.)  On November 11, 2014, Strunk filed a grievance complaining he was passed up for overtime in contravention of the collective bargaining agreement.  (*See* ECF No. 114-5 at 50.)

**Larry Vicary**

Larry Vicary began working at the Sheriff's Department as a correctional officer in 2008. (Vicary Dep. at 7.)  Vicary testified he did not participate in the no-confidence vote (*id.* at 35), and was never involved in any of the Sheriff's reelection campaigns (*id.* at 33).  Vicary also testified he signed up for a classification officer assignment, but was not chosen.  (Id. at 12-13.)  In November of 2014, Vicary resigned from the Sheriff's Department to work as a correctional officer at the Federal Bureau of Prisons. (*Id.* at 7-8.)  Vicary had not received any discipline while working at the jail.  (*Id.* at 10.)

**Steve VanDusen**

Steve VanDusen began working at the Sheriff's Department as a correctional officer in April 2000, and was promoted to sergeant in 2004.  (VanDusen Dep. at 9-10.)  On October 7, 2010, VanDusen was present at the union meeting and gave a speech in favor of the vote. (*Id.* at 20-21.)  VanDusen testified the content of his speech involved supporting Ron Davis, advocating for change, and communicating that the officers needed to make the issues that were going on at the jail known.  (*Id.* at 21.)  Although VanDusen was present at the meeting and gave a speech in favor of the vote, there is no evidence in the record he actually voted.  (*See generally*, *id.*)  VanDusen was also instrumental in bringing the idea of a no-confidence vote to union members and consulting with the union attorney.  (*Id.* at 16-19.)  VanDusen also testified he supported Ron Davis in the 2010 Sheriff's election and wore a Davis shirt at a debate between Huston and Davis.  (*Id.* at 24.)  VanDusen testified Sheriff Huston looked directly at him for nearly a minute before the debate began.  (*Id.* at 25.)  VanDusen also testified Superintendent Roth told

him "you f*cked up when you did a no-confidence vote and you need to go apologize if you want things to get better for you."  (*Id.* at 40.)  VanDusen's sergeant position was formally eliminated when the jail was reorganized in 2012.  (*Id.* at 40-41.)  VanDusen did not apply for the newly created JOS position.  (*Id.* at 41.)  Superintendent Kurt Ulrich testified that in 2011, he was a party to several conversations with Superintendent Helm and Sheriff Huston where they discussed classifying the JOS position as non-union.  (Ulrich Dep. at 41-42.)  In 2014, VanDusen became union president. (Resp., ¶ 66.) VanDusen has been active in the union since 2009 (VanDusen Dep. at 13-14) and testified he was one of the main people that filed grievances on its behalf (*id.* at 64.) VanDusen has been an FTO since 2003, but has not trained anyone since 2009, and was not being invited to FTO meetings.  (*Id.* at 30-33.)

## I.      The No-Confidence Vote

A Fraternal Order of Police ("FOP") Union meeting was held on October 7, 2010, in the community room at the Tazewell County Justice Center.  (MSJ, ¶ 49.)  A significant number of correctional officers and sergeants who were members of the union attended the meeting. (Ulrich Dep. at 76-78.)  At the beginning of the meeting, the union attorney announced there was going to be a no-confidence vote held against Sheriff Huston.  (*Id.* at 76.) Plaintiffs Hostetler, Karrick, Melloy, Moretto, Robertson, and Randolph were present at the meeting and participated in the vote.[4]  Plaintiff Steve VanDusen was in attendance and gave a brief speech in favor of the vote, but there is no indication in the record he actually voted.  Similarly, it is clear Plaintiffs Johnston and May were present at the union meeting, but there is no direct evidence that either officer voted.

---

[4] This material fact is taken directly from Plaintiffs' depositions (*see* Hostetler Dep. at 43-45; Karrick Dep. at 83, 91; Melloy Dep. at 126; Moretto Dep. at 43; Robertson Dep. at 18; Randolph Dep. at 105), as the Parties failed to directly address which Plaintiffs participated in the no-confidence vote in their summary judgment briefs.

During the meeting, a vote on whether the officers had confidence in Sheriff Huston was held by anonymous paper ballot. (MSJ, ¶ 52.) The day after the vote, the union's attorney issued a press release stating that 85% of correctional officers voted "no confidence" in the Sheriff. (*Id.*, ¶ 54.) Later that afternoon, Sheriff Huston held a news conference to publicly address the vote. (Huston Dep. at 149.) Huston was quoted in the Pekin Daily Times as stating, "I must assume that the jailers don't want to be subject to discipline, they don't want to be held accountable, they want . . . a sheriff who is a lodge brother—not a boss." (ECF No. 158-9 at 1-2.)

## A.     Plaintiffs Spoke as Private Citizens

The Court finds that Plaintiffs Hostetler, Karrick, Melloy, Moretto, Robertson, Randolph, and VanDusen spoke as private citizens on a matter of public concern when they participated in the October 7, 2010, no-confidence vote against Sheriff Huston. Although Plaintiffs failed to proffer evidence demonstrating VanDusen voted, the Court finds VanDusen's speech in favor of the vote constitutes protected activity. The Court does not find, however, that Plaintiffs mere presence at the union meeting constitutes protected speech, and Plaintiffs fail to suggest or argue otherwise.[5] As such, Plaintiffs Johnston and May fail to make a prima facie showing of retaliation and are excluded from this claim with the other Plaintiffs.

As it relates to the no-confidence vote, the Supreme Court has determined that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421 (emphasis added). "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Houskins*,

---

[5] *See* Resp. at 145-149.

549 F.3d at 490. Although the First Amendment does not protect a public employee's expressions made pursuant to his or her official responsibilities, if the public employee is speaking in his or her capacity as a union representative, they are speaking as citizens. *Graber v. Clarke*, 763 F.3d 888, 895 (7th Cir. 2014).

Here, the record is clear that Plaintiffs were not speaking *pursuant to their official duties* when they participated in the vote. The union meeting was held during the evening hours in the community room of the Justice Center, only union members were allowed to cast ballots, and the ballots were completed anonymously. Moreover, Defendants have failed to tender any evidence which suggests that Plaintiffs' job responsibilities included attending union meetings or participating in a no-confidence vote. There is evidence, however, that a significant number of union members chose not to attend the meeting or participate in the vote. (*See e.g.*, MSJ, ¶ 64.) As such, the Court finds Plaintiffs spoke as private citizens when casting their ballots, for or against, no-confidence in the Sheriff.

### B. Plaintiffs Spoke on a Matter of Public Concern

Plaintiffs were also speaking on a matter of public concern by participating in the vote. "The public concern element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson*, 290 F.3d at 907 (internal citation omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Content is the most important of these three factors. *Gustafson*, 290 F.3d at 907.

Here, it is evident from the record Plaintiffs' no-confidence vote was intended to have political ramifications, as the vote was conducted less than a month before the Sheriff's election,

the union issued a press release summarizing the vote results, and the Sheriff himself testified the intent of the vote was to influence the outcome of the election (Huston Dep. at 149-50). The Sheriff also called a press conference to respond to the results the same day the union's press release was issued. Thus, the context of the vote was a public statement in a highly politicized atmosphere. Finally, the form of the speech in question was an anonymous vote, the purpose of which was to demonstrate to the public that the officers no longer held confidence in the Sheriff. (*See, e.g.,* Johnston Dep. at 116-17.) ("[T]he only . . . recourse is [to] have a union say we don't have confidence in you.") Viewing the facts and reasonable inferences in the light most favorable to Plaintiffs, their participation in the union's no-confidence vote against Sheriff Huston involved a matter of public concern.

As it concerns Plaintiff VanDusen's speech in favor of the vote, his speech also meets the aforementioned criteria. VanDusen testified that he "spoke out in support of Davis" at the union meeting before the vote was held and argued "we needed change and we needed to make it known of the issues that were going on at the jail." (VanDusen Dep. at 21.) It is also a reasonable inference VanDusen was speaking in his role as a union representative at the meeting, as the content of his speech clearly indicates political support of the Sheriff's opponent in the wake of an election that would take place one month later. Accordingly, VanDusen was speaking as a private citizen on a matter of public concern when he gave a speech before the no-confidence vote.

### C.    The Balancing of Interests Favors Plaintiffs

The second part of the *Connick-Pickering* test involves balancing Plaintiffs' interests as citizens commenting on the matter against Defendants' interest in promoting effective and efficient public service. *Spiegla*, 481 F.3d at 965. As it relates to the no-confidence vote, Defendants fail to demonstrate their interests as employers outweigh Plaintiffs' interests in speaking out on a

matter of public concern. There is no evidence in the record, and Defendants fail to argue, that Plaintiffs' participation in the no-confidence vote created problems in maintaining discipline or harmony among coworkers. In fact, Defendants concede several Plaintiffs had no disciplinary history after the vote. (*See* MSJ, ¶¶ 338, 355, 359, 361, 364.) The "flurry of lawsuits" Defendants mention occurred before the no-confidence vote took place in October of 2010. (*See* MSJ, ¶¶ 18, 20, 22, 23, 26, 30, 35.)

Furthermore, personal loyalty was not a prerequisite for correctional officers, or even a sergeant, working in the Tazewell County Jail in 2010. The record also fails to demonstrate the vote impeded any of Plaintiffs' abilities to perform their responsibilities, as some were promoted (*see* Hostetler Dep. at 40), or obtained comparable work elsewhere (*see* Vicary Dep. at 8). Finally, the no-confidence vote was held in a public forum, outside of normal business hours, and was conducted anonymously. Several Plaintiffs testified the vote was due to dissatisfaction with the Sheriff's performance and his lack of attachment to the day-to-day operations of the jail. (Resp., ¶ 45.) The Court has already concluded (*see supra* pp. 18-20) Plaintiffs were speaking as private citizens when participating in the no-confidence vote one month before the 2010 Sheriff's election. Therefore, the Court finds the balance of interests favors Plaintiffs.

### D. Plaintiffs Suffered Deprivations Likely to Deter Free Speech

If one thing in this case is patently clear, it is that Plaintiffs allegedly endured a campaign of retaliation sufficient to deter the exercise of free speech by participating in the no-confidence vote. In November 2010, Hostetler was removed from her classification assignment and was re-assigned as pod officer. Defendant Helm testified classification officers receive a 7% pay bonus. (MSJ, ¶ 181.) Since 2010, both Karrick and Melloy have been passed over for FTO positions. In May 2011, Moretto lost her classification assignment and was re-assigned as a correctional officer

on third shift.  Randolph twice applied for an FTO position and also applied for a classification assignment, but was not selected.  Robertson applied for an FTO position, sought a classification assignment, and applied for a JOS position, but was not selected for any of these roles.  Robertson had initially been given a classification assignment, and had begun training for the position, when the training was suspended without explanation.  Finally, VanDusen's sergeant position was formally eliminated when the jail was reorganized in 2012.  The reorganization of the jail eliminated the rank and position of sergeant and returned those individuals to the position of jail officer.  (MSJ, ¶ 84.)  Although VanDusen was able to retain his sergeant's salary and seniority, the Court finds the stripping of his title and requiring him to apply to obtain the same position— one without union protection—could constitute an effective deterrent to the exercise of free speech.  VanDusen also testified he has been an FTO since 2003, but has not trained anyone since 2009, and was not being invited to FTO meetings.  (MSJ, ¶ 117.)  The Court finds all of these events qualify as deprivations likely to deter speech.

### E.    There Exists a Genuine Issue of Material Fact on the Question of Causation

"At summary judgment in First Amendment retaliation cases, the burden of proof for causation is divided and shifts between the parties."  *McGreal*, 850 F.3d at 312 (citing *Kidwell*, 679 F.3d at 965).  First, Plaintiffs must produce evidence that their speech was at least a motivating factor of Defendants' decision to take retaliatory action against them.  *Id.* at 313.  If Plaintiffs make this initial showing, the burden shifts to Defendants to rebut the causal inference.  *Id.*  Defendants can meet their burden by offering an alternative explanation for the suffered deprivation, showing that its decision would have been made in the absence of the protected speech.  *Id.*  If Defendants successfully rebut the causal inference, the burden shifts back to Plaintiffs to demonstrate Defendants' proffered reasons were pretextual and that the real reason was retaliatory animus.  *Id.*

"At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011). Alternatively, on summary judgment, the plaintiff's burden is simply to demonstrate that there is a genuine issue of material fact on the question of causation. *Yahnke*, 823 F.3d at 1071.

### 1. Plaintiffs' No-Confidence Vote as a Motivating Factor

To show a causal connection between the deprivations Plaintiffs suffered and the no-confidence vote, Plaintiffs must first demonstrate Defendants knew of the no-confidence vote. *See Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech."). Here, Plaintiffs have adduced sufficient evidence for a finder of fact to reasonably conclude Defendants knew of the October 7, 2010, no-confidence vote. Sheriff Huston testified he heard about the possibility of a no-confidence vote before it was even held from Sergeant Jennifer Stanton. (Huston Dep. at 13.) The Sheriff also publicly responded to the vote via a televised news conference the same day the vote results were released to the media. (*Id.* at 149.) Superintendent Helm testified he heard about the no-confidence vote on the day of the vote (Helm Dep. at 21), and Defendant Kurt Ulrich testified he spoke with Helm the day after the vote. (Ulrich Dep. at 82.) Ulrich also testified he told Helm that Moretto and VanDusen voted in favor of no confidence and he (Ulrich) voted against it. (*Id.* at 83-84.) Then, Ulrich testified that Helm said he was going to tell the Sheriff. (*Id.* at 84.) Finally, Superintendent Bill Roth testified he learned of the vote from correctional officers when he was stationed on third shift at the jail. (Roth Dep. at 23.)

In support of their burden to produce evidence that demonstrates the no-confidence vote was at least a "motivating factor" for Defendants' actions, Plaintiffs have proffered sufficient circumstantial evidence to satisfy the requisite showing. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Kidwell*, 679 F.3d at 966. Multiple Plaintiffs testified Superintendent Roth told them that if they apologized to the Sheriff for the vote, things would get better. Plaintiffs also testified they were referred to as "problem children," "troublemakers," and "union radicals." (MSJ, ¶¶ 230, 234.) In terms of suspicious timing, since the no-confidence vote, Plaintiffs have been excluded from advancement opportunities, including being denied positions as FTOs, Jail Operations Supervisors, and classification officers. The position of sergeant was also eliminated and replaced by the non-union JOS position. Finally, Plaintiffs have submitted adequate evidence to create a genuine issue of material fact as to whether they were treated differently than other employees in regard to their workers' compensation claims, light-duty requests, and accrued time donations. (*Compare* Resp., ¶ 211 at 62, ¶ 280 at 70, ¶ 131 at 124; ¶¶ 264, 266-69, at 16; *with* Reply, ¶ 212 at 41; ¶ 131 at 19; ¶ 211 at 29-30.)

### 2. Defendants' Fail to Rebut the Causal Inference

To successfully rebut the causal inference of retaliation established by Plaintiffs, Defendants must offer alternative explanations for Plaintiffs' suffered deprivations, demonstrating their decisions would have been made in the absence of the protected speech. As it relates to the October 7, 2010, no-confidence vote, Plaintiffs Hostetler, Karrick, Melloy, Moretto, Robertson, and Randolph have sufficiently established First Amendment retaliation claims against Defendants. Defendants respond to Plaintiffs' allegations by asserting "[t]here are good reasons for the actions taken by [them]." (MSJ at 96.) They contend command staff was reorganized to

address a perceived lack of adequate supervision and discipline in light of lawsuits and other misconduct arising from the operation of the jail. (*Id.*) Defendants also assert that "[m]any of the Plaintiffs here did not seek positions they claim were denied to them, such as deputy, FTO, [c]lassification [o]fficer, or JOS." (*Id.* at 98.)

However, Defendants fail to adduce sufficient evidence to demonstrate Plaintiffs' alleged deprivations would have occurred without their participation in the no-confidence vote. The threadbare argumentation (four undeveloped assertions, two of which remain unsubstantiated by reference to facts)[6] and irrelevant evidence[7] Defendants offer, does not satisfy their burden to demonstrate they are entitled to judgment as a matter of law on this issue. The Court also concludes Plaintiffs have offered sufficient evidence upon which a rational finder of fact could infer Defendants' proffered reasons are pretext. (*See e.g.*, MSJ at 98) ("Many of the officers did not seek positions that they claim were denied to them, such as deputy, FTO, [c]lassification [o]fficer, or JOS.")

Construing all facts and reasonable inferences in their favor, Plaintiffs have demonstrated the aforementioned correctional officers participated in the no-confidence vote, Sheriff Huston and the other Defendants possessed sufficient information to determine which officers voted against the Sheriff, and the Defendants engaged in retaliatory behavior toward each Plaintiff because of their vote—whether Defendants' speculation of Plaintiffs' voting persuasion was accurate or not. For the aforementioned reasons, Plaintiffs Hostetler, Karrick, Melloy, Moretto, Robertson, and Randolph may proceed with their First Amendment retaliation claims based on political activity against Defendants. A jury will resolve the factual dispute concerning which Defendants, if any, were responsible for the retaliatory action(s) against Plaintiffs.

---

[6] *See* MSJ at 96-99.
[7] *See, e.g.,* MSJ at ¶¶ 3, 8, 11, 14, 17, 18, 19, 20, 22, 23, 29, 37-40, 95-100.

## II. Sheriff Huston's Reelection Campaign

Less than one month after the October 7, 2010, union meeting and no-confidence vote, Sheriff Huston was up for reelection. (MSJ, ¶ 65.) Huston's opponent, Ron Davis, was endorsed by the FOP union (*see* Huston Dep. at 19), and a number of correctional officers at the jail supported him. Plaintiffs Johnston, Karrick, Melloy, Moretto, and VanDusen testified they openly supported Davis during the campaign. Karrick testified Superintendent Helm was aware she supported Davis because of a conversation Helm had with her concerning her Facebook activity. Karrick also testified Helm told her "there's a group of jailers that are driving a bus off a cliff over there" and if they're not careful they're going to take [Karrick] with them."

Steve VanDusen testified he attended a debate during the 2010 Sheriff's campaign wearing a Ron Davis shirt. VanDusen also testified Sheriff Huston was aware of his attendance because the Sheriff looked directly at VanDusen for nearly a minute before the debate started. Richard Johnston testified he made it known to other correctional officers he was supporting Ron Davis. Johnston also attended a debate between the candidates and a few democratic fundraisers for Davis. Finally, Sheriff Huston testified he was aware some employees supported his opponent in the 2010 Sheriff's race. (Huston Dep. at 18.) Of the Plaintiffs, Sheriff Huston testified he knew Melloy made a $300 donation to Ron Davis based on his opponent's financial reports filed with the state board of elections. (*Id.*)

### A. There Exists a Genuine Issue of Material Fact on the Question of Causation

As it concerns Plaintiffs' political support of Ron Davis in 2010, there is no dispute Plaintiffs' campaign activity constituted protected speech. Defendants concede as much in their

summary judgment motion[8] and the caselaw is clear that Plaintiffs' political activity constitutes free speech and is protected. *See Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004) ("It is well established that hiring, firing, or transferring government employees based on political motivation violates the First Amendment, with certain exceptions for policymaking positions and for employees having a confidential relationship with a superior."). Instead, Defendants argue there is a lack of evidence Sheriff Huston was aware of "most" of Plaintiffs' support for Davis, and even if he was, the statute of limitations serves as a bar to their political activity. (*See* MSJ at 86-87.)

On summary judgment, Plaintiffs' burden is to demonstrate there is a genuine issue of material fact on the question of causation, which, in both scenarios, Plaintiffs have done. Through deposition testimony, Plaintiffs have established they publicly supported Davis during the 2010 Tazewell County Sheriff's election. Plaintiffs have also proffered sufficient evidence for a reasonable finder of fact to draw the inference Defendants possessed enough information to determine which Plaintiffs supported Davis in the 2010 campaign and retaliated against him or her because of it. Accordingly, Plaintiffs Johnston, Karrick, Melloy, Moretto, and VanDusen may proceed on their claim of First Amendment retaliation based on political association against Defendants.

### III. Dismissed Claims: Retaliation Based on Grievance Activity

While Plaintiffs Hostetler, Johnston, Karrick, Melloy, Moretto, Randolph, Robertson, and VanDusen have demonstrated they participated in one or both of the aforementioned protected activities, Plaintiffs Hutton, May, Mehrzad, Strunk, and Vicary have failed to demonstrate they participated in either. Hutton alleges she was retaliated against as a member of a group of correctional officers, and as a female, but she fails to trace the retaliation back to any protected

---

[8] *See* MSJ at 86 ("Speech that was political, such as actual involvement in the 2010 campaign (Facts 65-74), would be protected.").

activity. May testified he was present at the union meeting where the no-confidence vote was held, but fails to prove he actually voted. Mehrzad began working at the Sheriff's Department in March 2013, and fails to allege she was involved in any protected activity which may have resulted in retaliation. Strunk testified he did not participate in the no-confidence vote and was not involved in any of the Sheriff's reelection campaigns. Vicary offers numerous allegations he was the victim of retaliation (Vicary Dep. at 12-13; 33-34), but he fails to demonstrate he engaged in any protected speech which may have spurred the retaliatory behavior. Without evidence they engaged in protected speech for which they were subject to retaliation, Plaintiffs Hutton, May, Mehrzad, Strunk, and Vicary fail to establish a prima facie case for retaliation and their claims are DISMISSED.

### A. Plaintiffs' Grievances Fail to Address Matters of Public Concern

Plaintiffs allege a large number of the individual grievances they filed throughout their tenure at the Sheriff's Department "touch on issues of public concern" and constitute protected speech for which they are entitled protection. (*See* Resp. at 148-49.) However, Defendants argue, and this Court agrees, Plaintiffs' personal grievances fail to rise to the level of speaking on matters of public concern. As to whether Plaintiffs' grievances address a matter of public concern, the Seventh Circuit recently observed:

> Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement. The *Connick* test requires us to look at the overall objective or point of the speech, as ascertained by those three factors. Of the three factors, content is the most important, but the subject matter of the speech is not determinative. Rather, we must focus on the particular content (as opposed to the subject matter) of the speech. The motive of the speaker is relevant as part of the context in which the speech was made but is not dispositive. In sum, we ask whether the objective of the speech—as determined by content form, and context—was to bring wrongdoing to light or to further some purely private interest.

*Kubiak v. City of Chicago*, 810 F.3d 476, 482-83 (7th Cir. 2016) (internal citations omitted).

Here, Plaintiffs contend their individual grievances touch on issues of public concern such as violations of the Merit Board Act, (MSJ, ¶ 159), violations of employee's Weingarten rights, (*Id.*, ¶ 148), gender discrimination, officer allocation, and officer safety from excessive overtime (*Id.*, ¶¶ 165-68, 352), harassment (Resp., ¶ 191 at 133), department-wide issues (*Id.* at ¶¶ 147, 187; MSJ, ¶¶ 147, 150-51, 153, 164, 167, 191, 205, 255-56), privatization of the jail (Resp., ¶¶ 171, 174-75; MSJ, ¶ 43), elimination of the sergeant position and removal of the JOS position from the collective bargaining unit (MSJ, ¶¶ 152, 154; Resp., ¶¶ 84, 190).

However, upon closer inspection, the Court finds the grievances in question were primarily for the private purpose of resolving workplace issues. Additionally, the context and form of the grievances are consistent with the vindication of work-related interests, rather than public concern. The content of the grievances—while theoretically touching on subjects of potential interest to the public—does not convince the Court that their purpose was anything other than personal. Thus, even if the public would have been interested in, for example, gender preference in shift bidding, or overtime policies at the jail, there is no indication from the grievances themselves that Plaintiffs were attempting to bring those overarching issues to public light. (*See e.g.*, ECF No. 114-5 at 48, 50.) Rather, the content, form, and context of the grievances demonstrate their overall objective was primarily to further private workplace interests on a myriad of issues. Finally, even if the Court were to construe some of Plaintiffs' grievances as relating to matters of public concern, Plaintiffs fail to adduce sufficient evidence to create a genuine issue of material fact on the question of causation, as they have submitted little to no evidence they were retaliated against due to their grievance activity. (*See* Resp. at 161-63.) Accordingly, Defendants' motion for summary judgment as it relates to Plaintiffs' grievances is GRANTED, and Plaintiffs' retaliation claims based on grievance activity are DISMISSED.

## IV.  Plaintiffs' *Monell* Custom or Policy Claim Survives

Within their three-paragraph argument asserting Plaintiffs failed to establish a *Monell* custom or policy claim, Defendants contend (i) there is no evidence of a policy to infringe upon First Amendment rights; (ii) the January 29, 2012, Tazewell County Employee Speech policy is to the contrary; (iii) most of the policy decisions were done by the County Board; (iv) most of the Defendants are not policymakers; and (v) Plaintiffs have failed to demonstrate a custom or policy was the "moving force" behind a constitutional violation.  (MSJ at 101-02.)  Defendants then concede reorganizing the jail command was a policy decision by the Sheriff; the Sheriff is a policymaker; and Defendants have made policy decisions, such as the decision to eliminate the rank and position of sergeant.  (*Id.*)  Construing the facts and reasonable inferences in the light most favorable to Plaintiffs, and applying the aforementioned concessions, the Court finds Plaintiffs have adduced sufficient evidence to proceed on their theory of *Monell* liability against Tazewell County and the Tazewell County Sheriff's Department.

Under a *Monell* theory of liability, a plaintiff suing a municipality or comparable entity is required to demonstrate the entity's official policy, widespread custom, or action by an official with policy-making authority, was the "moving force" behind her constitutional injury. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).  In Illinois, a sheriff has final policy-making authority, *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000), and a single unconstitutional act by a final policymaker can be enough for *Monell* liability.  *See Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) ("It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once.").

Here, Plaintiffs have provided sufficient evidence for a reasonable jury to infer retaliation was the moving force behind Plaintiffs' constitutional injuries. Plaintiffs testified they were told if they apologized to the Sheriff for their participation in the no-confidence vote, things would get better for them. Plaintiffs also testified Sheriff Huston told them he thought the problems were on third shift where there were strong union members and he would "hire six ball breakers from the streets if he had to straighten them out." Finally, Defendants concede Sheriff Huston made the policy decision to reorganize the jail command, which had the effect of demoting the officers in the sergeant position by eliminating the position and requiring the officers to apply for a non-union position in order to retain their job duties. In light of this evidence, Defendants' motion for summary judgment on *Monell* liability is DENIED.

## V. Defendant Lower is Entitled to Summary Judgment; Defendants Helm, Roth, and Ulrich are not

As previously discussed, Plaintiffs have submitted sufficient evidence to demonstrate they were speaking as private citizens on matters of public concern when they participated in the no-confidence vote and supported Ron Davis in the 2010 Sheriff's election. Plaintiffs have also adduced sufficient evidence to demonstrate the balancing of interests weighs in their favor and that they suffered deprivations likely to deter their protected speech. If the employee has been found to have engaged in constitutionally protected speech and suffered a deprivation likely to deter that speech, the court then moves on to the final, "motivating factor" requirement. At the summary judgment phase, Plaintiffs' burden is to simply demonstrate there is a genuine issue of material fact on the question of causation.

Here, Plaintiffs have proffered sufficient evidence to demonstrate there is a genuine issue of material fact as to whether Defendants Helm, Roth, and Ulrich retaliated against them for their protected activity. However, Plaintiffs have failed to proffer similar evidence that demonstrates a

genuine issue of material fact exists as to whether Defendant Lower retaliated against them for the same protected speech. All Defendants concede they knew about Plaintiffs' participation in the no-confidence vote, and Defendants were in positions of power/influence where they could implement action that was detrimental to Plaintiffs. While Defendants Helm, Roth, and Ulrich assert valid reasons for their behavior toward Plaintiffs, a reasonable jury could conclude Defendants' proffered reasons were pretext based on the evidence that suggests otherwise.

### A. Jail Superintendent Earl Helm

Superintendent Earl Helm was hired by Tazewell County as a correctional officer in 1981, and was promoted to sergeant in 1990. (Helm Dep. at 10.) Helm was named Jail Superintendent in December 1999 and served in that capacity until his retirement on March 1, 2013. (*Id.* at 9-10.) As Jail Superintendent, Helm was involved in the selection process for the Field Training Officer position and testified it was his ultimate decision as to which officers would be FTOs. (*Id.* at 41-43.) Helm also testified he took part in assigning officers to the classification officer position (*id.* at 69), and was involved in the decision to remove Moretto from the position in 2011 (*id.* at 70-73.)

Helm testified he heard about the results of the no-confidence vote on the day of the vote, but he does not recall how. Defendant Ulrich testified that the day after the vote, he spoke to Helm about the vote results. Ulrich also testified he told Helm that Moretto and VanDusen voted in favor of no-confidence and he (Ulrich) voted against it. Helm also testified he had second-hand knowledge of the correctional officers who supported Ron Davis in the election. (*Id.* at 23.)

Michelle Moretto testified Superintendent Helm and Ulrich retaliated against her by removing her from a classification position and reassigning her as a pod officer in May 2011. (Moretto Dep. at 48.) On May 16, 2011, Helm posted a sign-up sheet for officers interested in the

classification officer assignment.  (MSJ, ¶ 191.)  Moretto testified Helm did not post the sign-up sheet until she informed him she was filing a grievance against him for not posting the position. (ECF No. 158-1, ¶ 4.)  Moretto also testified prior to the May 16, 2011, posting, Helm had already picked Lindsey Rogers for the position.  (*Id.*)

Aleisha Karrick also testified she told Helm she was not comfortable taking Moretto's position as classification officer and that Helm responded, "they dug their own grave," in reference to Moretto and Hostetler being removed from the position.  Karrick also testified Helm told her that "there's a group of jailers that are driving a bus off a cliff over there and if they're not careful they're going to take you with them."  Karrick added that Helm's comment to her was made in the context of pro-Ron Davis comments on her Facebook account before the FOP's no-confidence vote.  Dawn Hostetler was also reassigned from classification to pod officer in November 2010. Hostetler was the only classification officer when she was reassigned.

Finally, Helm testified that he and Sheriff Huston had discussions concerning the sergeant position before the position was eliminated.  (Helm Dep. at 48.)  Helm also testified that, at the old jail, sergeants were in the same bargaining unit as the correctional officers and command staff had a problem with bargaining unit members supervising other bargaining unit members.  (*Id.* at 49-50.)  Helm admits the goal was to make the JOS position non-union.  (*Id.* at 50.)  Accordingly, Plaintiffs' surviving retaliation claims directed at Defendant Helm stand, and his request for summary judgment is DENIED.

### B.     Chief Deputy Jeff Lower

Jeff Lower has been Chief Deputy at the Sheriff's Department since 2010. (Lower Dep. at 7.)   Lower volunteered with the Department starting in 1988, joined the Department as a deputy in 1991, and was promoted to sergeant in 1999 and to patrol captain in

2006. (*Id.* at 7-11.) As Chief Deputy, Lower guides, manages, and directs all the law enforcement assets for the Department. (*Id.* at 12-13.) Lower also testified, that since 2010, he has participated in selecting and interviewing new deputies. (*Id.* at 17.) Lower stated he heard about the no-confidence vote through the media, and that more than likely, he spoke with Superintendent Helm and Ulrich about it after the no-confidence vote. (*Id.* at 30-31.)

As it relates to Chief Deputy Lower, Plaintiffs fail to offer any substantiated evidence Lower retaliated against them individually for their protected activity. While Lower may have known about Plaintiffs' protected activity, there is insufficient evidence in the record for a reasonable jury to conclude Lower took adverse action against them because of it. In addition, Plaintiffs concede "[n]one of the Plaintiffs have been on the list or hired as a deputy since 2010 because none of them applied and scored high enough to get in the 'upper portion of the list' until recently," and categorize the fact as immaterial in their Response. (Resp., ¶ 229, at 95.) The allegation (even if proven true) that in December 2011, deputies received coats and knives from Sheriff Huston and correctional officers received nothing, has no impact on the retaliation allegations at hand. Accordingly, any and all surviving retaliation claims against Chief Deputy Lower fail, and he is DISMISSED as a Party from this suit.

### C.     Deputy Jail Superintendent Bill Roth

Bill Roth was hired as a Jail Operations Supervisor at the Sheriff's Department in March 2012. (Roth Dep. at 6.) Roth was promoted to Deputy Jail Superintendent in March 2013, and retired in November 2015. (*Id.* at 19-20.) Roth testified he learned of the no-confidence vote from correctional officers while he was working third shift as a JOS. (*Id.* at 23.) Roth also testified it was possible officers Moretto, VanDusen, and Hostetler complained to him that they were demoted or removed from their previous positions because of their participation in the 2010 no-confidence

vote.  (*Id.* at 25-26.)  Roth testified he "might have had a conversation with Kurt Ulrich . . . . and it's possible [he] could have had a conversation with the sheriff also" about their complaints. (*Id.* at 26.)  Roth stated that in his command role at the jail, he did not have the authority to hire or fire any of the correctional officers.  (*Id.* at 42, 51.)  However, Roth did testify he had input as to whether an officer would receive a Field Training Officer designation, and he would deliver his input to Ulrich and Sheriff Huston.  (*Id.* at 107.)

As it relates to Deputy Jail Superintendent Roth, Plaintiffs have proffered sufficient circumstantial evidence for a fact-finder to conclude their participation in protected activity was a "motivating factor" for the alleged retaliatory action Roth took against them.  Moretto testified Roth told her he was brought in "to straighten us out, to eliminate the union meetings."  (Moretto Dep. at 82.)  Karrick testified her "job became a lot harder" after she told Sheriff Huston she voted "no confidence because it needed to change."  (Karrick Dep. at 91.)  Specifically, Karrick alleges "that was when Roth started following me around and staring at me all of the time."  (*Id.* at 92.) Karrick contends her participation in the no-confidence vote was the reason behind Roth treating her differently.  (*Id.* at 100.)  Finally, at least six Plaintiffs testified Roth made comments to them to the effect, "if they apologized for their participation in the no-confidence vote, things would get better for them."  (*See supra*, pp. 9-17.)  At the summary judgment phase, even if rebutted by the Defendant, the issue of whether Superintendent Roth retaliated against Plaintiffs because of their protected speech must go to a jury.  Accordingly, Plaintiffs' retaliation claims related to their participation in the no-confidence vote that are directed at Defendant Roth stand, and his request for summary judgment is DENIED.

##### D.    Deputy Jail Superintendent Kurt Ulrich

The Sheriff's Department hired Kurt Ulrich as a correctional officer in 1987. (Ulrich Dep. at 10.)  Ulrich was promoted to the position of sergeant in 1990, and was again promoted to Deputy Jail Superintendent in January 2012.  (*Id.*)  Ulrich took over Superintendent Helm's position when Helm retired.  (*Id.* at 11.)  Ulrich testified he was aware of Plaintiffs' participation in the no-confidence vote, as he was present at the meeting when the vote was taken. (*Id.* at 75.)  Ulrich also testified he recalls Steve VanDusen standing up and speaking at the meeting, but he does not remember what he said.  (*Id.* at 77.)  Ulrich testified he remembers the vote being taken by a show of hands and that VanDusen and Moretto raised their hands in favor of no-confidence against the Sheriff.  (*Id.* at 77-79.)  Ulrich stated he was upset about the vote against the Sheriff because "Sheriff Huston has done a lot for us. He is the reason we were in the building we were in, the jail. He got everything passed, the tax to get that – the funds for the facility. And I . . . feel like I had a good work environment. I was happy there." (*Id.* at 79.)  Ulrich testified he voted against the no-confidence vote (i.e., for the Sheriff).  (*Id.* at 80.)

Ulrich also testified he spoke with Superintendent Helm the day after the vote.  (*Id.* at 82.) Ulrich testified he told Helm how Moretto and VanDusen voted, and that he also told Helm he voted for the Sheriff.  (*Id.* at 83-84.)  Ulrich testified he heard some of the officers supported Ron Davis in the 2010 Sheriff's election, but the information he received was secondhand.  (*Id.* at 86.) Ulrich also testified, as a sergeant, he was involved in the process of deciding which officers would become Field Training Officers.  (*Id.* at 119.)  Ulrich testified when he became a Deputy Jail Superintendent, he would have the final call as to who would become an FTO.  (*Id.* at 121.)

Rebecca Melloy testified she has been passed over for an FTO position numerous times since 2010.  Melloy also testified that Superintendent Ulrich and/or the Sheriff most likely decided

whether she should receive that position. (Melloy Dep. at 61.) Ulrich testified he remembers Melloy being a candidate for an FTO position, and that some of his commanders were not comfortable with her in that position. (Ulrich Dep. at 126-27.) Ulrich testified two commanders in particular were not comfortable with Melloy in the position, but the commanders did not bring more specific concerns to his attention regarding her candidacy. (*Id.* at 127.) Aleisha Karrick also testified she heard Ulrich use the terms "problem children, troublemakers, or union radicals" to describe some of the Plaintiffs. (Karrick Dep. at 128.) Finally, Ulrich testified he had multiple conversations with Superintendent Helm and Sheriff Huston regarding the reason(s) for creating the Jail Operations Supervisor position. (*Id.* at 41-42.) Ulrich stated the conversations took place in the Sheriff's Office (*id.* at 42), and that Helm and Huston were talking about making a nonunion position because they were unhappy with the sergeants' actions (*id.* at 44).

As it relates to the claims against Superintendent Ulrich, Plaintiffs have adduced sufficient evidence to demonstrate there is a genuine issue of material fact on the question of causation. Melloy, for example, claims she was denied an FTO position because of her participation in the no-confidence vote. Melloy indicates it was Ulrich who made the decision to reject her as an applicant. Ulrich claims he made the decision to deny Melloy an FTO position, but it was only because two of his commanders failed to endorse her. Therein lies a factual dispute for a jury to decide. There is also sufficient circumstantial evidence in the record for a reasonable jury to conclude Superintendent Ulrich's reasons for denying Melloy the position were pretext and that he unlawfully retaliated against her (at least in part) because of her participation in protected speech. Accordingly, the Court cannot grant summary judgment to Superintendent Ulrich, and he remains a Defendant in this case.

## VI.     Defendants' Retaliatory Conduct Constitutes a Continuing Violation

The Seventh Circuit "has consistently held that the limitations period applicable to § 1983 actions brought in Illinois is the two-year period for general personal injury actions[.]" *Woods v. Ill. Dep't of Children & Family Services*, 710 F.3d 762, 766 (7th Cir. 2013). "Generally, the statute of limitations clock begins to run on First Amendment retaliation claims immediately after the retaliatory act occurred." *Gekas v. Vasiliades*, 814 F.3d 890, 894 (7th Cir. 2016). However, "[w]hen a plaintiff alleges that [unlawful conduct] is leading to an ongoing harm, [she] can 'reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit [her] to sue separately over every incident of the defendant's unlawful conduct.'" *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). In such a case, the statute of limitations "starts to run (that is, the cause of action accrues) from the date of the last incidence of that violation, not the first." *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013).

Although Plaintiffs fail to allege any hostile environment claims, the retaliation claims that survive summary judgment share important characteristics with actionable hostile environment ones. Here, the Court adopts much of the reasoning outlined by the Supreme Court in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), to demonstrate its decision. Both hostile work environment and retaliation claims may consist of repeated unlawful activity which may occur over a series of years. Additionally, in direct contrast to discrete discriminatory acts, a single act of retaliation may not be actionable on its own. In the case at hand, Plaintiffs' claims are based on the cumulative effect of individual acts of retaliation. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (holding a campaign of petty harassment is sufficient to deter the exercise of free speech). As such, the protected activity in which Plaintiffs participated is not

too remote in time to be barred by the statute of limitations under the continuing violation doctrine. Defendants' largely unsupported argument[9] that Plaintiffs' claims are barred because the alleged retaliatory conduct consisted of discrete discriminatory acts fails as a matter of law, and their motion on this basis is DENIED.

### VII. Defendants are Not Entitled to Qualified Immunity

Defendants also argue they are entitled to qualified immunity, but limit their argument to Plaintiffs' grievance activity. (MSJ at 100.) Defendants contend "Plaintiffs cannot be allowed to hamstring management of the jail just by complaining," and cite the Second Circuit's decision in *Lynch v. Ackley*, 811 F.3d 569 (2nd Cir. 2016), as being dispositive of the issue. (*Id.* at 100.) While Defendants' arguments may have merit, the First Amendment retaliation claims that survive summary judgment are more straightforward. Additionally, Defendants' fail to address Plaintiffs' political activity in their qualified immunity analysis. As such, the Court finds Defendants are not entitled to qualified immunity as it relates to Plaintiff's participation in the October 7, 2010, no-confidence vote and their support of Ron Davis in the Sheriff's election.

"Qualified immunity is, as the term implies, qualified." *Sornberger v. City of Knoxville, Illinois*, 434 F.3d 1006, 1014 (7th Cir. 2006). "It contemplates instances in which a public official's actions are not protected because the official knew or should have known he was violating an individual's constitutional rights." *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 506 (1978)). The qualified immunity analysis involves a two-part inquiry. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). "The first question is whether the defendants' conduct violated a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second question is whether that particular constitutional right was 'clearly established' at the time of the

---

[9] *See* MSJ at 78-81.

alleged violation." *Id.* Whether the right was clearly established at the time of the alleged violation is typically a question of law. *Estate of Williams by Rose v. Cline*, 902 F.3d 643, 649 (7th Cir. 2018) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)).

Defendants fail to elucidate any argument as to how qualified immunity shields them from liability from the surviving claims. (*See generally*, MSJ at 99-100.) The Court has also determined, construing the facts and inferences in the light most favorable to Plaintiffs, a reasonable jury could find Defendants violated Plaintiffs' constitutional rights. Moreover, in 2010, the law was clear that it was illegal to retaliate against a public employee because of his or her engagement in constitutionally protected speech. *See Connick v. Myers*, 461 U.S. 138, 142 (1983) ("For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."). The law has also been clear that voting and political activity, in particular, constitute protected speech. *See Elrod v. Burns*, 427 U.S. 347, 355 (1976) (reasoning that conditioning employment on political activity pressures employees to pledge political allegiance to a party with which they prefer not to associate, to work for the election of political candidates they do not support, and to contribute money to be used to further policies with which they do not agree). Defendants have conceded as much in their testimony. (*See, e.g.*, Huston Dep. at 156). Therefore, Defendants' motion for summary judgment on the basis of qualified immunity is DENIED.

**VIII.   Supplemental Jurisdiction over Plaintiff's State Law Claim**

Although not addressed in Plaintiffs' Second Amended Complaint, or Defendants' summary judgment motion, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law discrimination claim under the Illinois Human Rights Act. "[T]he issue whether [supplemental] jurisdiction has been properly assumed is one which remains open

throughout the litigation." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). To exercise supplemental jurisdiction, the state and federal claims must derive from a common nucleus of operative fact," such that "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." *Id.*

Here, Plaintiffs' retaliation claims pursuant to section 1983 clearly fall within the Court's original jurisdiction. However, Plaintiff Mehrzad's state law discrimination claim does not derive from the same nucleus of operative facts as do Plaintiffs' surviving retaliation claims. Mehrzad began work as a full-time correctional officer at the Tazewell County Sheriff's Department in March 2013, nearly two and a half years after the 2010 no-confidence vote and Sheriff's election. Moreover, Mehrzad's pregnancy discrimination claim centers around her January 2015 light-duty request, which has no substantiated connection to the aforementioned protected speech or retaliation thereof. Finally, were the Court to exercise supplemental jurisdiction over her state law claim, it would need to conduct two separate trials to address the legal and factual differences among Plaintiffs' retaliation claims and Mehrzad's pregnancy discrimination claim. Accordingly, the Court declines to exercise supplemental jurisdiction over Mehrzad's claim, and it is hereby DISMISSED WITHOUT PREJUDICE.

## CONCLUSION

For the reasons stated herein, Defendants' Second Amended Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. Defendants' Motion is GRANTED as to Plaintiffs' First Amendment retaliation claims based on grievance activity and as to any and all claims against Defendant Jeff Lower. Defendants' Motion is DENIED with respect to Plaintiffs' retaliation claims based on their participation in the October 7, 2010, no-confidence vote and Plaintiffs' political support of Ron Davis in the 2010 Tazewell County Sheriff's election.

The Court declines to exercise supplemental jurisdiction over Plaintiff Mehrzad's pregnancy discrimination claim, and it is DISMISSED WITHOUT PREJUDICE. The Clerk is directed to terminate Plaintiffs Hutton, May, Mehrzad, Strunk, and Vicary, and Defendant Lower as Parties in this matter. The Court will contact the remaining Parties to schedule the final pretrial conference and jury trial for this cause.

ENTERED this 19th day of February 2019.

_____/s/ Michael M. Mihm_____
Michael M. Mihm
U.S. District Court Judge